UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
AUDREY GORE,

                              Plaintiff,

                                                    **MEMORANDUM & ORDER**

         -against-
                                                    02 CV 2432 (RJD) (LB)

HEALTH RESEARCH INSTITUTE; NEW
YORK STATE DEPARTMENT OF HEALTH;
NEW YORK STATE DEPARTMENT OF
CIVIL SERVICE,

                              Defendants.
-----------------------------------------------------------X
DEARIE, Chief Judge.

         Plaintiff, formerly an employee of defendant Health Research Institute ("HRI"), brought

this pro se action alleging sexual harassment, sex discrimination, and retaliation in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). HRI, the only

defendant remaining in the case, moved for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. The Court referred the motion to Magistrate Judge Lois

Bloom for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On March 8,

2007, Magistrate Judge Bloom issued an Amended Report and Recommendation, recommending

that defendant's motion be granted. On March 20, 2007, plaintiff filed timely objections. Upon

de novo review, the Court grants summary judgment for defendant.

# BACKGROUND[1]

## A.    Factual Background

Plaintiff's employment with defendant HRI began on September 12, 1991, when she was hired as a Senior Secretary. Def.'s Local Rule 56.1 Statement of Material Facts [hereinafter Def.'s Statement] at ¶ 3. In 1992, she became an Administrative Aide in the Women's Services Unit of HRI's AIDS Institute. Id. ¶ 4. She continued in this position until her suspension on December 30, 1998. Id. Her duties included filing, typing, handling telephone calls and faxes, copying and distributing documents, and setting up meetings. Id. ¶ 12.

According to defendant, plaintiff's job performance was problematic almost from the beginning of her seven-year tenure at HRI. On April 6, 1993, defendant issued a performance evaluation characterizing plaintiff's performance as "needs some improvement" and citing several specific problems, including excessive use of the telephone for personal calls and inappropriate handling of incoming calls. Id. ¶ 15; Wilson Aff. Ex. D. On October 14, 1993, defendant issued a Notice of Discipline ("NOD") charging plaintiff with misconduct and nonperformance and seeking her termination. Specifically, the NOD alleged that plaintiff had directed a racial slur at one of her supervisors and had disobeyed supervisors' directives on two other occasions. Def.'s Statement ¶¶ 17-18; Wilson Aff. Ex. E. On December 9, 1993, defendant issued a second NOD, again seeking termination, and this time alleging that plaintiff

---

[1] Unless otherwise noted, the facts described here are undisputed. Although plaintiff submitted a response to defendant's Local Rule 56.1 Statement of Material Facts, her submission did not include specific answers to defendant's factual allegations, as required under Local Rule 56.1(b); nor did it offer her own comprehensive statement of the facts relevant to this case. Taking into account plaintiff's pro se status, however, the Court looks to the factual allegations contained in plaintiff's response, complaint, deposition testimony, and other submissions, and deems admitted only those of defendant's statements that plaintiff nowhere contests.

had mishandled "a stack of important files," had misdirected "urgent overnight mail," had failed

to comply with her supervisor's instructions, and had failed to communicate properly about a

"critical" scheduling matter. Def.'s Statement ¶ 19; Wilson Aff. Ex. F. In both cases, the

issuance of an NOD was authorized by Michael Barth, then Executive Director of HRI. Barth

Aff. ¶¶ 5, 7. Defendant agreed with plaintiff's union, the Civil Service Employees Association,

Inc. ("CSEA"), to consolidate the two 1993 NODs and take them to arbitration; the result was a

consent award under which plaintiff received a two-week suspension. Def.'s Statement ¶ 20;

Wilson Aff. Ex. G.

      In 1995 and 1996, in response to continuing problems with plaintiff's performance, HRI

supervisors conducted what defendant describes as "formal counseling sessions" with plaintiff.

Def.'s Statement ¶¶ 21-22; Wilson Aff. Exs. I, J. In 1997, Lavinia Morrison, Director of

Administration for the AIDS Institute, conducted an investigation that generated a 106-page

memorandum documenting problems with plaintiff's performance and recommending her

dismissal. Def.'s Statement ¶¶ 7, 23-24, Wilson Aff. Ex. M. HRI Human Resources Director

Dolores Wilson then conducted a second investigation, which included an interview with

plaintiff. Def.'s Statement ¶¶ 8, 26-28. On February 12, 1998, defendant issued a third NOD

describing thirty-five instances of misconduct and nonperformance and seeking plaintiff's

termination. Id. ¶ 32; Wilson Aff. Ex. N. In a fourth NOD, issued on April 23, 1998, defendant

added ten charges of misconduct and nonperformance; again, it sought plaintiff's dismissal.

Def.'s Statement ¶ 35; Wilson Aff. Ex. O. Finally, on December 30, 1998, defendant issued a

fifth NOD, containing an additional seven charges and imposing a penalty of "[t]ermination with

immediate suspension without pay." Def.'s Statement ¶ 38; Wilson Aff. Ex. P. Wilson

conducted investigations prior to the issuance of the fourth and fifth NODs, but did not interview plaintiff. Def.'s Statement ¶¶ 35, 38. As before, HRI Executive Director Barth authorized the issuance of each NOD. Barth Aff. ¶ 10.

Plaintiff and CSEA grieved the third through fifth NODs. Def.'s Statement ¶¶ 33, 36, 39. Defendant and CSEA agreed to consolidate those three NODs and took them to arbitration. Id. ¶ 40. The arbitration, at which plaintiff was represented by counsel, took place over the space of a year and involved ten days of testimony by fifteen witnesses, including plaintiff. Id. ¶¶ 41-42. On January 21, 2001, in a seventy-three page decision, arbitrator Eric Schmertz described plaintiff as "an employee who for a long period of time has been unwilling to correctly perform even the simplest of job duties," Diddel Aff. Ex. M [hereinafter Arbitration Opinion] at 65, and sustained, at least in part, forty-three of the fifty-two charges against her. Def.'s Statement ¶ 44, Arbitration Opinion passim. Concluding that firing plaintiff was defendant's "only viable option," Schmertz upheld her suspension and termination. Arbitration Opinion at 67.

Plaintiff's view of the facts is markedly different. According to plaintiff, she "had no work performance problems (no more than an average employee in any company)," Compl. at 5, and the disciplinary measures defendant took against her constituted harassment. Specifically, she cites Dolores Wilson's 1997 "interrogation" prior to defendant's issuance of the third NOD, as well as the NODs themselves. NYSDHR Compl. at 1. She alleges that, beginning in 1993, Roberta Stewart, who served as Assistant Director and later Director of HRI's Women's Services Unit, engaged in a "ploy" whose purpose was to bring about her dismissal. Gore Dep. at 272. Plaintiff also maintains that her coworkers and supervisors testified against her at the 1998 arbitration in a concerted effort to "sabotage" her employment. Id. at 147-48. In response,

4

defendant argues that the disciplinary measures it took against plaintiff were legitimate responses to her misconduct and failure to perform her job. It offers affidavits from nine current and former HRI employees containing detailed descriptions of plaintiff's conduct in the workplace. See generally Agatstein, Barth, Candelas, Hecht, Lettlow, Morrison, Singh, Stewart, & Wilson Affs.

Plaintiff also claims to have been subjected to other forms of harassment, including verbal abuse. She alleges that in 1996, Helen Gasch, who served as Director of the Women's Services Unit until that year, asked her whether she had ever fantasized about another woman, Gore Dep. at 150-51, 270-71. In response, defendant offers a sworn affidavit in which Gasch denies that this occurred. Lettlow Aff. ¶ 20. Plaintiff alleges further that on more than one occasion prior to Gasch's 1996 departure from HRI, Gasch spoke loudly to her "in a negative manner like [she was] trying to embarrass [plaintiff]," Gore Dep. at 156. Defendant does not dispute this claim. Plaintiff also alleges generally that her coworkers teased her on the subject of homosexuality, id. at 151-52; and that they engaged in conversations about their own sex lives in her presence, id. at 270. Defendant responds that the "conversations that took place around Plaintiff were not sexually motivated, involved both men and women, and did not involve sexually derogatory comments," Def.'s Statement ¶ 57.

Plaintiff claims, as well, that other employees at HRI, including her supervisors, touched her inappropriately. Beginning in 1992 or 1993 and continuing until 1994 or 1995, according to plaintiff, Helen Gasch and a second HRI employee, Alma Candelas, touched plaintiff on the shoulders and neck while giving her work to do. Gore Dep. at 89-91, 97-103, 152-54, 157-58, 181. The precise nature of this contact is unclear; plaintiff describes it as "touching on the

shoulder or rubbing around," id. at 89, but also as "massages and back rubs," id. at 154. Also

unclear is how often this touching occurred; plaintiff testified that Candelas touched her

"[w]henever [Candelas] would come over" to plaintiff's desk, id. at 101, but when asked directly

how often Candelas and Gasch had touched her, plaintiff testified only that both women had

engaged in this behavior "several times," id. at 100-03. Although plaintiff indicates that this

contact made her uncomfortable, id. at 91, she concedes that others might have been comfortable

with it, id. at 99, and that she did not complain to either woman, but instead communicated her

discomfort via body language. Id. Plaintiff claims, as well, without saying when it occurred, that

Roberta Stewart leaned over her in a way that made her uncomfortable while giving her

assignments; plaintiff concedes, however, that she did not interpret the gesture as a sexual

advance. Id. at 265-67. Plaintiff also alleges inappropriate touching on the part of Barbara

Agatstein, a supervisor in HRI's AIDS Institute. Plaintiff alleges that "a couple of times," while

Agatstein was seated at her desk, and plaintiff was standing beside the desk, Agatstein placed her

hand on the edge of the desk in such a way that it came into contact with plaintiff's thigh. Id. at

103-04. Plaintiff alleges further that on December 24, 1998, Agatstein "grabbed" or "fumbled"

plaintiff's backside. Am. NYSDHR Compl. at 1; Gore Dep. at 92-95, 352-53. When asked how

long this contact lasted, plaintiff testified: "It was a second." Id. at 353. In response to

plaintiff's claims of inappropriate physical contact, defendant offers the affidavit of Helen Gasch,

in which Gasch states that she has "no recollection of ever touching [plaintiff] at any point,"

Lettlow Aff. ¶ 13; an affidavit of Alma Candelas, in which Candelas acknowledges that she does

"occasionally touch people on the shoulder," but states that she "never massaged anyone's neck,

shoulder, or back at work," and notes that plaintiff never told her that she had made plaintiff

6

uncomfortable in any way, Candelas Aff. ¶¶ 7, 9; an affidavit of Roberta Stewart, in which

Stewart denies that she has ever "experienced or observed anyone being subjected to a workplace

made hostile on the basis of their sex," Stewart Aff. ¶ 61; and an affidavit of Barbara Agatstein,

in which Agatstein swears that she "never knowingly, willingly, made physical contact with

[plaintiff]," Agatstein Aff. ¶ 26.

One of plaintiff's claims concerns an incident that did not involve physical contact but

that she interpreted as sexual in nature. In 1991 or 1992, plaintiff claims, HRI Director of

Administration Lavinia Morrison went to plaintiff's home to retrieve a bag containing

Morrison's personal items that plaintiff had brought home from work at Morrison's request.

When she arrived at plaintiff's home, Morrison asked to use the bathroom, which plaintiff

viewed as a sexual advance. Gore Dep. at 209-10. In response, defendant offers Morrison's

sworn affidavit, which describes plaintiff's account as "literally unbelievable" and "devoid of any

factual basis." Morrison Aff. ¶ 56.

Finally, plaintiff alleges that HRI supervisors harassed her coworkers. Two such claims

are based on plaintiff's firsthand knowledge. Plaintiff claims that in 1991 or 1992, she several

times observed Barbara Agatstein approach Stephanie McNeil, an HRI secretary, while McNeil

was making photocopies, and stand behind McNeil, "touching [McNeil] with her body." Id. at

194-98. In 1996 or 1997, plaintiff reports, she several times observed Agatstein call temporary

secretary Sheila Settles into her office and "rub" Settles's breasts while showing her work-related

papers; some time afterward, plaintiff adds, Settles was dismissed. Id. at 198-205. Other of

plaintiff's claims regarding her coworkers are based on the reports of others. Plaintiff claims that

Sheila Settles told her she believed she was fired for refusing to acquiesce in Barbara Agatstein's

sexual advances. Id. at 200-01. Plaintiff also claims to have been told by Mary Jane Angalada, another former HRI employee, that Angalada filed a sexual harassment complaint against Sharon Hecht, an HRI contract manager. Id. at 325-28. Finally, plaintiff claims to have been told by others that Lavinia Morrison made sexual advances to two temporary secretaries, and that one of the two was dismissed after rebuffing Morrison. Id. at 206-09, 497-504. Plaintiff is unable to recall the two temporary secretaries' last names, referring to them simply as Lisa and Sharon. Specifically, plaintiff claims that she and Lisa were friends, and that after Lisa was dismissed, in 1994 or 1995, Lisa told plaintiff it was because she had rebuffed Morrison after seeing her socially on a number of occasions, id. at 497-500. Regarding Sharon, plaintiff claims that she left HRI on her own, but also that she reported to plaintiff that Morrison was "funny," id. at 503, and that Morrison "used to like to touch [Sharon] a lot," id. at 206. In response to plaintiff's claims regarding Barbara Agatstein, defendant offers the sworn affidavit of HRI human resources director Dolores Wilson, in which Wilson declares that "[a]t no point in Ms. Agatstein's history at the AIDS Institute has HRI ever received a single complaint about her conduct or the way she treats other people in the workplace." Wilson Aff. ¶ 107. Defendant does not respond directly to plaintiff's claims to have heard at second hand about the harassment of other HRI employees by Sharon Hecht and Lavinia Morrison.

**B.      Procedural History**

On August 4, 1998, nearly five months prior to her December 30, 1998 suspension, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") in which she alleged that defendant had engaged in sexual harassment of five types: "(a)

8

Interrogating me, (b) Issuing me three Notices of Disciplinary Action with a recommendation of termination, (c) Verbally abusing me, (d) Physically touching me and (e) Sabotaging my work." NYSDHR Compl. at 1-2. On January 19, 1999, plaintiff filed an amended complaint in which she alleged that her suspension, which had occurred roughly three weeks earlier, had constituted retaliation for filing her initial complaint. She suggested, as well, that her suspension had resulted from her refusal to acquiesce in the "sexual advances" of Barbara Agatstein on December 24, 1998. Am. NYSDHR Compl. at 1.

On November 19, 2001, having conducted its own investigation, NYSDHR found no probable cause to believe that HRI had engaged in the unlawful discriminatory practices plaintiff alleged, and dismissed her complaint. Diddel Aff. Ex. N. It found that plaintiff's allegations were "general and vague," that she had failed to provide sufficient evidence to substantiate them, and that even if they were accurate, the conduct she alleged would not rise to the level of sexual harassment under New York law. Id. at 2. It also deemed some of plaintiff's claims untimely. It noted that although two of the individuals plaintiff accused of harassment, Roberta Stewart and Helen Gasch, had ceased to supervise plaintiff by 1996,[2] plaintiff did not file her complaint until 1998, well beyond the one-year statute of limitations for violations of the New York State Human Rights Law. Id. at 1-2. It noted, as well, that although plaintiff claimed to have made numerous reports of harassment to HRI's human resources department, there was no record of her having done so. Id. at 2. Finally, NYSDHR found that the record demonstrated that plaintiff had performance problems throughout her tenure at HRI. Id.

_____

[2] In fact, the record reflects that Roberta Stewart continued to supervise plaintiff until her suspension in 1998. See Def.'s Statement ¶ 6.

On April 16, 2002, plaintiff initiated the instant lawsuit.

## DISCUSSION

The Court interprets plaintiff's complaint as presenting the following claims: (1) that she was subjected to sexual harassment in the form of a hostile work environment; (2) that her termination constituted discrimination on the basis of sex; and (3) that defendant retaliated against her for complaining about the discrimination she claims to have endured. For the reasons explained below, the Court grants summary judgment for defendant on all three claims.

### A. Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991). "[T]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Where a litigant proceeds pro se, the Court must interpret her supporting papers "to raise the strongest arguments that they suggest." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion

are not credible, or upon the mere allegations or denials of the adverse party's pleading,"

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (internal

quotation marks and citation omitted). Rather, the party opposing summary judgment must "set

forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).


**B.      Sexual Orientation**

As a preliminary matter, the Court notes that to the extent that plaintiff alleges

discrimination on the basis of sexual orientation, rather than gender, her claim fails as a matter of

law, since discrimination on the basis of sexual orientation is not actionable under Title VII.

Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000) ("Because the term 'sex' in Title VII refers

only to membership in a class delineated by gender, and not to sexual affiliation, Title VII does

not proscribe discrimination because of sexual orientation."). It is clear that plaintiff alleges that

she was mistreated at least in part because she was not a lesbian. See Compl. at 2 ("[Defendant]

made the working environment very hostile for anyone who was not lesbian or bi-sexual or did

not allow certain individuals to fumble on various parts of their bodies."). However, contrary to

defendant's contention, Def.'s Mem. Supp. Mot. Summ. J. [hereinafter Def.'s Mem.] at 30

("Plaintiff here does not allege that she has been discriminated against based on her sex . . . ."),

plaintiff *does* appear to allege discrimination on the basis of sex, as well as on the basis of sexual

orientation. In her NYSDHR complaint, plaintiff declares: "I am continuously treated in this

manner because of my sex and have been damaged thereby." When asked at her deposition

whether she was "convinced that the reason [she was] terminated and suspended is because [she

was] not gay," she answered that she was not, and explained that it was because she "didn't go

11

along with the touchy feelie." Gore Dep. at 108. And when she claimed that Alma Candelas and Helen Gasch inappropriately touched her back and shoulders, plaintiff indicated that only women received similar treatment. Id. at 153. The Court therefore proceeds to a consideration of the merits of plaintiff's claims.

## C.    Hostile Work Environment

Title VII forbids an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a). The Supreme Court has declared that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). While discrimination on the basis of sexual orientation is not actionable under Title VII, Simonton, 232 F.3d 36, same-sex sexual harassment is, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998) ("[N]othing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex.").

In order to make out a prima facie case, a plaintiff alleging that her employer violated Title VII by creating a hostile work environment must show "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks

and citation omitted, first and third alterations in original). The incidents of which a plaintiff complains "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (internal quotation marks and citation omitted). The required showing "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (quoting Harris, 510 U.S. at 21). In addition, a plaintiff must show that the actions of which she complains were taken *because of her sex*: "[I]t is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." Id. (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).

"Whether sexual harassment alters the conditions of employment 'is not, and by its nature cannot be, a mathematically precise test.'" Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006) (quoting Harris, 510 U.S. at 22). "There is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment . . . ." Alfano, 294 F.3d at 379. Rather, in weighing a hostile work environment claim, the Court "must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 69 (1986)). It must do so "on a case by case basis

considering all the individual facts at hand." Schiano, 445 F.3d at 607.

The Supreme Court has offered a non-exhaustive list of factors the Court may consider in weighing a hostile work environment claim: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Court's inquiry into the "totality of the circumstances" may include not only acts committed against a plaintiff, but also acts committed against her coworkers. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."). The inquiry also may encompass both overtly sexual and facially sex-neutral conduct: "There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination—for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano, 294 F.3d at 375. However, the Court properly considers sex-neutral conduct only where there is "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory," id. at 378, as, for example, "where the same individual is accused of multiple acts of harassment, some overtly sexual and some not," id. at 375.

Turning to the specific allegations of workplace harassment at issue in this case, the Court notes that several of plaintiff's claims are not supported by competent evidence. To support her contention that Sheila Settles and the temporary secretary Lisa were dismissed for rebuffing the sexual advances of their supervisors, plaintiff offers only her own testimony that Settles and Lisa told her it was so. Not only are these statements conclusory; they are also

14

hearsay and speculation. See Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004)

(granting summary judgment for defendants in a Title VII case and observing that "an affidavit's

hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient

to create a genuine issue for trial."); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)

("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment."). Similarly, plaintiff offers no competent evidence that Lavinia Morrison

harassed the temporary secretary Sharon, but only repeats at second hand Sharon's assertion,

without particulars, that Morrison "liked to touch." Also unsupported is plaintiff's claim that

Mary Jane Angalada filed a complaint against Sharon Hecht. These claims, conclusory and

inadmissible, do not support plaintiff's effort to defeat this motion for summary judgment.[3]

Meanwhile, many of plaintiff's allegations concerning facially sex-neutral incidents,

while supported by competent evidence, must be excluded from consideration, because plaintiff

has not created a basis for inferring that those incidents occurred *because of sex*. Most

significantly, this conclusion applies to plaintiff's claims regarding the disciplinary measures

HRI took against her. Plaintiff offers nothing more than conclusory assertions that these

measures constituted part of a pattern of harassment. See NYSDHR Compl. at 1-2; Gore Dep.

255-60. Defendant, for its part, responds with copious documentary evidence to substantiate its

claim to have taken disciplinary measures against plaintiff on the basis of her misconduct and

---

[3] The Court notes that during discovery before Magistrate Judge Bloom, plaintiff sought defendant's personnel files for Agatstein, Angalada, and Hecht, but defendant objected to their disclosure. The record does not demonstrate that plaintiff was entitled to receive the files she sought, however, or that defendant engaged in misconduct by withholding them. Moreover, there is no guarantee that the files would have substantiated plaintiff's allegations, and the mere possibility they might have done so is insufficient to overcome a motion for summary judgment.

nonperformance, not her sex, including: (1) copies of the five NODs it issued against her, each accompanied by descriptions of specific problems with her performance, Wilson Aff. Exs. E, F, N, O, P; (2) sworn affidavits from other HRI employees detailing plaintiff's failure to perform adequately and her disruptive impact on the workplace, see Agatstein, Barth, Candelas, Hecht, Lettlow, Morrison, Singh, Stewart, & Wilson Affs.; (3) the 1997 memorandum recommending plaintiff's termination, to which are attached dozens of email messages vividly portraying plaintiff's misconduct and nonperformance, as well as defendant's efforts to provide her with training, Wilson Aff. Ex. M; and (4) the 1998 arbitration decision upholding HRI's decision to terminate plaintiff. Moreover, while some of the individuals whom plaintiff accuses of harassing her may have participated in the process that led to the issuance of the five NODs, defendant has shown that each NOD was authorized by HRI Executive Director Michael Barth, who is not accused of misconduct.

With regard to plaintiff's related claim that Roberta Stewart engaged in a "vindictive, malicious ploy" to "sabotage" plaintiff's employment, Gore Dep. at 272, plaintiff has failed to adduce facts sufficient to permit a reasonable trier of fact to conclude that this conduct occurred at all, much less that it occurred because of plaintiff's sex. Plaintiff makes this claim with specificity only in her deposition testimony, which includes the allegation that Stewart induced Ramlochand Singh, another HRI employee who supervised plaintiff, to send emails inaccurately accusing plaintiff of misconduct. Id. at 271-72. And the only evidence plaintiff offers is her own claim to have overheard a conversation in which Stewart told Singh "what to do, what to write down." Id. at 271. The Court is of course required to draw all inferences in favor of plaintiff. However, in light of the evidence supporting defendant's contention that both Stewart and Singh

16

had legitimate reasons to complain about plaintiff's job performance, plaintiff's testimony about such a conversation is insufficient to create a question of fact as to whether Stewart "sabotaged" plaintiff. Further, even if plaintiff could demonstrate that Stewart sabotaged her, she has established no basis for inferring that she was sabotaged *because of sex*. Indeed, as defendant points out, Def.'s Mem. at 55, plaintiff has accused Stewart of "backstabbing" "just about everybody in the unit," including male employees, Gore Dep. at 538. Thus plaintiff's claim of sabotage also must be excluded from consideration.

The same conclusion applies to plaintiff's claim that Lavinia Morrison asked to use her bathroom, as well as to her claim that Roberta Stewart leaned over her while assigning her work. Plaintiff has adduced no evidence to suggest that either facially sex-neutral incident occurred because of sex. Although Morrison "is accused of multiple acts of harassment, some overtly sexual and some not," Alfano, 294 F.3d at 375, there is no competent evidence to support plaintiff's allegations of overtly sexual misconduct, as noted above, and plaintiff does not even allege that Stewart engaged in overtly sexual acts of harassment. Nor does plaintiff claim that either form of misconduct was directly solely at female employees.

With regard to plaintiff's remaining allegations, the Court finds that even if some basis exists for inferring that the events plaintiff describes occurred because of her sex (and the Court need not hold that it does), those events do not rise to the level of severity and pervasiveness required for a hostile work environment under Title VII. As noted above, the Supreme Court has declared that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Breeden, 532 U.S. at 271 (internal quotation marks and citation omitted). But that is precisely

17

the nature of plaintiff's allegations. She alleges teasing by her coworkers, as well as criticism

and an offhand remark by a supervisor; she claims to have endured a series of minor incidents of

inappropriate touching, as well as one more significant incident, with a gap of at least three years

between them; and she claims to have witnessed two series of incidents, separated by at least five

years, in which a supervisor touched another employee. Presented with these claims, a rational

factfinder could not conclude that plaintiff had demonstrated that her workplace was "permeated

with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21 (internal quotation

marks and citation omitted). The incidents she describes are "too few, too separate in time, and

too mild" to have created a hostile work environment for purposes of Title VII. Alfano, 294 F.3d

at 380. Further, although mindful of the Second Circuit's warning that "[p]rior cases in which

we have concluded that a reasonable juror could find that the work environment was objectively

hostile do not 'establish a baseline' that subsequent plaintiffs must reach in order to prevail,"

Schiano, 445 F.3d at 606 (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d

426, 439 (2d Cir. 1999)), the Court notes that this result is in line with "the standard so far

delineated by the case law," Alfano, 294 F.3d at 379-80 (collecting cases).


**D.    Sex Discrimination**

In order to make out a prima facie case of sex discrimination, plaintiff must show that

"(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered

an adverse employment action; and (4) the action occurred under circumstances giving rise to an

inference of discrimination." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir.

1999). The Second Circuit has described the plaintiff's prima facie burden in a Title VII

18

employment case as "minimal." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). If

a plaintiff overcomes this initial hurdle, "the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the adverse action." Norville, 196 F.3d at 95. Finally,

"[i]f the employer meets its burden, the plaintiff . . . must prove that the articulated justification

is in fact a pretext for discrimination." Id.

Plaintiff has not made out a prima facie case of sex discrimination. As a woman, she

belongs to a protected class, and her dismissal clearly was an adverse employment action. On the

question whether plaintiff was "qualified for her position," although defendant argues that

"plaintiff has failed to demonstrate that her job performance was satisfactory," Def.'s Mem. at

36, this is not the test; plaintiff need only show that she "possesses the basic skills necessary for

the job," Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (quoting

Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978)). It is not necessary for the Court

to say whether plaintiff has shown that she possesses the necessary skills, however, since she has

failed to satisfy the fourth element of the prima facie requirement: She has adduced insufficient

evidence to support the inference that her dismissal constituted discrimination. Moreover, even

if plaintiff had made out a prima facie case, defendant has articulated legitimate,

nondiscriminatory reasons for her termination, and plaintiff has failed to show that the proffered

reasons are merely a pretext.

As defendant points out, plaintiff does not support the contention that her dismissal

constituted discrimination on the basis of sex by "avail[ing] herself of any of the typical

evidentiary avenues," e.g., by showing that male employees were treated more favorably, or that

a male employee replaced her. Def.'s Mem. at 43. Of course, resort to "typical evidentiary

avenues" is not required, see Brown v. Henderson, 257 F.3d 246, 253 (2d Cir. 2001) ("[T]hough it is helpful in proving sex discrimination, we have held that it is not strictly necessary for a plaintiff to identify an employee who was treated more favorably than the plaintiff and who was similarly situated to the plaintiff, except for being of the opposite sex."). But plaintiff also does not adduce any *other* variety of evidence to create an inference that her firing was an act of discrimination, instead offering only the conclusory statement that she was dismissed because she "didn't go along with the touchy feelie," Gore Dep. at 108, together with conclusory (and likely inadmissible) statements concerning the reasons why other employees were disciplined or dismissed, Pl.'s Opp. Def.'s Mot. Dismiss ¶ 9.

Defendant, meanwhile, has offered ample evidence substantiating its claim to have dismissed plaintiff for misconduct and nonperformance, and not because of her sex. Particularly significant is the 1998 arbitration opinion. As already noted, the arbitrator upheld defendant's decision to dismiss plaintiff in a seventy-three page opinion based on ten days of testimony by fifteen witnesses. He observed: "Grievant is not an employee who has occasionally made a few minor mistakes on the job. Rather, she is an employee who for a long period of time had been unwilling to correctly perform even the simplest of job duties." Arbitration Opinion at 65. He described plaintiff as "indifferent to her performance and insensitive to the burdens she has imposed on co-workers, supervisors and managers," as well as "distracted, confrontational, arrogant, uncooperative and uncaring about her employment." Id. at 65-66. He noted that plaintiff was "unwilling and unable to accept constructive criticism or the counseling which was offered to help her improve her performance," and that "[w]hen errors are pointed out to her, she reacts, almost without exception, defensively with allegations that others, who are out to

20

sabotage her, are at fault." Id. at 66. He concluded: "Termination is the employer's only viable

option . . . . [Grievant's] unwillingness to perform even the simplest tasks as instructed when

coupled with her open hostility toward persons within and without the agency created a work

environment that the Employer need no longer tolerate." Id. at 67.

The Second Circuit has held that "[w]here an employee's ultimate termination depends

upon, and is allowed by, a decision of an independent and unbiased arbitrator based on

substantial evidence after a fair hearing, the arbitration decision has probative weight regarding

the requisite causal link between an employee's termination and the employer's illegal motive."

Collins v. New York City Transit Auth., 305 F.3d 113, 115 (2d Cir. 2002). The Collins court

cautioned that "[a] negative arbitration decision rendered under a [collective bargaining

agreement] does not preclude a Title VII action by a discharged employee." Id. at 119. It

declared, however, that

> a decision by an independent tribunal that is not itself subject to a claim of bias
> will attenuate a plaintiff's proof of the requisite causal link. Where . . . that
> decision follows an evidentiary hearing, and is based on substantial evidence, the
> Title VII plaintiff, to survive a motion for summary judgment, must present strong
> evidence that the decision was wrong as a matter of fact—e.g. new evidence not
> before the tribunal—or that the impartiality of the proceeding was somehow
> compromised.

Id. The plaintiff in Collins failed to present such "strong evidence." Accordingly, even though

he had "proffered (barely) enough evidence to create an issue of fact over whether [his

termination reflected discrimination or retaliation]," the court found that this evidence was "not

sufficient to overcome the additional probative weight of the arbitration award allowing his

termination," and granted summary judgment for his employer. Id.

Although plaintiff does attack the 1998 arbitration, claiming that arbitrator Schmertz

showed "prejudice and partial judgment," Pl.'s Obj. Report & Recommendation [hereinafter Pl.'s Mem.] at 3, she does not provide "strong evidence"—or, for that matter, any evidence—to substantiate this claim. Plaintiff raises four specific objections. First, she claims she was absent from work on several dates on which defendant claimed she had engaged in misconduct, id. at 3, 6. As defendant points out, however, in several cases, the allegations to which plaintiff objects referred to conduct occurring "on or about" a particular date, Def.'s Mem. at 46—so plaintiff's argument that she was not present on the particular date mentioned is unavailing. Likewise, in other instances, the arbitrator properly conformed the dates in defendant's allegations to the record of plaintiff's attendance. In addition, plaintiff offers no "new evidence [that was] not before the tribunal," since the arbitrator considered and rejected plaintiff's argument, finding that "[a]ny inaccuracy as to dates is excused as nonprejudicial to Grievant." Arbitration Opinion at 67. Second, plaintiff claims that the disciplinary measures defendant took against her were procedurally deficient, in that defendant did not in every case interview her prior to issuing an NOD, Pl.'s Mem. at 7. But the arbitrator considered and rejected this argument, as well, noting the existence of "a substantial body of arbitral precedent holding that a failure to interview an employee before disciplinary charges are filed can be excused under a variety of circumstances such as where the grievant is not prejudiced as a result." Id. at 13-14. Third, plaintiff claims that although her collective bargaining agreement permitted defendant to suspend her only provided that her presence in the workplace "represented a potential danger to persons or property" or "would severely interfere with operations," defendant had never claimed that she "was a threat to the work environment." Pl.'s Mem. at 4. The record refutes this claim; the fourth NOD declared that plaintiff's "presence in the workplace [was] counterproductive to any level of efficiency,

teamwork, or productivity." Wilson Aff. Ex. O. Finally, plaintiff claims that she never used a

racial slur during a conversation with Helen Gasch, Pl.'s Mem. at 4-5. But this claim is

contradicted by the sworn statement of Helen Gasch that she did so. Lettlow Aff. ¶ 6. Moreover,

even if plaintiff never used a racial slur, the record contains other incidents of misconduct which

are more than sufficient to have justified her firing.

The extent of the evidence in this case, and the extent of the arbitrator's analysis,

considerably exceed those in Collins, where the arbitrator issued a fourteen-page opinion after

three days of hearings. That the arbitration decision in this case did not address allegations of

discrimination does not destroy its probative value. See Brinson v. New York City Transit Auth.,

60 F. Supp. 2d 23, 30 (E.D.N.Y. 1999) (recognizing that "arbitration governed by a collective

bargaining agreement with a plaintiff's union may not protect concerns regarding race in every

instance," but giving "significant weight" to an arbitration decision that did not address

discrimination in granting summary judgment in a Title VII employment discrimination case).

And for the reasons explained above, plaintiff's attack on the fairness of the arbitration is

unavailing. The Court therefore ascribes considerable weight to the arbitrator's decision, and

finds that it more than outweighs the conclusory statements offered by plaintiff to show that her

termination occurred under circumstances giving rise to an inference of discrimination.

Even if plaintiff had made out a prima facie case of sex discrimination, her claim would

still fail as a matter of law, since defendant has articulated legitimate, nondiscriminatory reasons

for her dismissal, and plaintiff has failed to show that those reasons are merely pretextual. As

already described, defendant offers voluminous evidence substantiating its claim to have

dismissed plaintiff on the basis of her misconduct and nonperformance, not on the basis of her

sex. As noted, plaintiff responds by claiming that the arbitration that sustained her dismissal was tainted by prejudice; she contends, as well, that she performed her job adequately. But plaintiff's attack on the arbitration fails, for the reasons discussed above, and defendant refutes her claim of satisfactory job performance. Specifically, to plaintiff's observation that she "was never given an unsatisfactory review," Pl.'s Mem. at 7, defendant responds that plaintiff received only one performance review during her seven-year tenure, that this review came soon after she was hired, and that it described her performance as "need[ing] some improvement," Def.'s Reply Mem. Supp. Mot. Summ. J. [hereinafter Def.'s Reply] at 7. Likewise, to plaintiff's claim to have "received all her raises," Pl.'s Mem. at 7, defendant responds that it was obligated under the collective bargaining agreement to implement periodic salary increases, Def.'s Reply at 7. In sum: Because plaintiff has not made out a prima facie case, and because, even if she had, she has failed to show that defendant's proffered reasons for dismissing her were merely pretextual, the Court grants summary judgment for defendant with regard to plaintiff's claim that her termination constituted discrimination in violation of Title VII.

### E.     Retaliation

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter; or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, a plaintiff must show that: "(1) [she] was engaged in protected activity; (2) the employer was aware of that

24

activity; (3) [she] suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996). "Once the plaintiff has presented a prima facie case of retaliation, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action." Id. at 1181 (internal quotation marks and citations omitted). Finally, "[i]f the defendant states a legitimate reason for its action, the burden . . . shifts back to the plaintiff to prove that the proffered reason is a pretext." Id.

The first prong of the prima facie standard requires that plaintiff have taken "action . . . to protest or oppose statutorily prohibited discrimination." Cruz, 202 F.3d at 566. This includes, for example, "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Id. (quotation marks and citation omitted). In order to satisfy this prong, a plaintiff need not show that the conduct of which she complained actually violated Title VII; she need only show that she had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (citation omitted).

Plaintiff's amended NYSDHR complaint indicates that she viewed her suspension as retaliation not only for filing her initial complaint, but also for her refusal to acquiesce during the December 24, 1988 incident in which Barbara Agatstein is alleged to have grabbed her backside. Specifically, plaintiff claims she responded to that incident by stating that she would "look upon this as an accident or mistake," Am. Compl. at 1. But this statement does not constitute a protected activity for the purposes of Title VII. "While there are no magic words that must be

25

used when complaining about a supervisor, in order to [engage in] protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring." Ramos v. City of New York, No. 96 Civ. 3787, 1997 U.S. Dist. LEXIS 10538, at *7 (S.D.N.Y. July 22, 1997). Although "[c]omplaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language," Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345 (S.D.N.Y. 2007), "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity," id. Even if defendant was aware of plaintiff's statement (and defendant insists it was not, Def.'s Mem. at 71-72), that statement appears less likely to have put defendant on notice of a problem than to have reassured defendant that plaintiff did *not* construe Agatstein's conduct as harassment, but rather as "an accident or mistake."

With regard to plaintiff's claim that defendant dismissed her in retaliation for her initial NYSDHR complaint, plaintiff has satisfied the first three elements of the prima facie test. Filing a formal discrimination complaint clearly is a protected activity under Title VII, and defendant does not dispute that it was aware that plaintiff did so, or that plaintiff afterward suffered an adverse employment action. Plaintiff has failed to make out a prima facie case, however, in that she has not demonstrated a causal connection between her complaint and her suspension and eventual termination. Defendant first sought plaintiff's termination in 1993, fully five years before plaintiff filed her complaint with the NYSDHR. Defendant began a concerted effort to dismiss plaintiff in 1997, a year in advance of plaintiff's NYSDHR filing, by launching an investigation and producing a report recommending that she be fired. It is not necessary for an employer to suspend an adverse employment action already in progress upon learning that the

employee in question has filed a discrimination complaint. See Holmes v. Long Island R.R., No. 96-CV-6196, 2001 U.S. Dist. LEXIS 10431, at *22 (E.D.N.Y. June 4, 2001) ("[A]n employer need not suspend a previously planned action against an employee upon discovering that a Title VII suit ha[s] been filed, 'and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'") (quoting Breeden, 532 U.S. at 272). Furthermore, even if defendant's efforts to fire plaintiff had begun after she filed her complaint, the fact that five years separated the two events would preclude her from establishing causation. See Breeden, 532 U.S. at 273 (gap of twenty months precluded plaintiff alleging retaliation from establishing causation).

Finally, even if plaintiff had made out a prima facie case of retaliation, as noted above, defendant has articulated legitimate reasons for its decision to terminate her, and she has not shown that its proffered reasons are merely a pretext for discrimination. Thus the Court grants summary judgment for defendant on plaintiff's claim that her firing constituted retaliation in violation of Title VII.

**F.     Conclusion**

For the reasons explained above, defendant's motion for summary judgment is granted as to all three of plaintiff's claims: that defendant engaged in sexual harassment by creating a hostile work environment; that plaintiff's termination constituted discrimination on the basis of

sex; and that her termination constituted retaliation for engaging in a protected activity.


SO ORDERED.

Dated: Brooklyn, New York
     April _16_, 2007

                              s/ Judge Raymond J. Dearie
                              _____
                              RAYMOND J. DEARIE
                              United States District Judge